UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____
                                                :
Aetna Life Insurance Company,   :
                                                :    Civil Action No._____
                      Plaintiff,          :
     v.                                      :    **COMPLAINT**
                                                :
                                                :    **JURY TRIAL DEMANDED**
Fast Lab Technologies, LLC, and :
Martin Perlin, MD,                    :
                                                :
                      Defendants.     :
_____:

Plaintiff Aetna Life Insurance Company ("Plaintiff" or "Aetna"), by and through its undersigned counsel, brings this Complaint against Defendants Fast Lab Technologies, LLC ("Fast Lab") and Martin Perlin, MD ("Dr. Perlin," and together with Fast Lab, "Defendants"), and alleges as follows:

## INTRODUCTION

1. Aetna brings this action to redress Defendants' fraudulent scheme to profit from the COVID-19 pandemic.

2. In the Spring of 2020, when the COVID-19 virus first began to spread throughout the population, many healthcare professionals performed heroically to assist patients in confronting this deadly threat.

3. Defendants, by contrast, seized the opportunity to exploit the crisis by creating a sham testing business.

4. Fast Lab was created in 2021 by a fashion photographer, and shortly thereafter hired Dr. Perlin as its medical director. Dr. Perlin is a doctor whose license to practice in Connecticut was previously suspended for questionable practices.

5. Recognizing the opportunity provided by a regulatory environment requiring coverage and payment of COVID-19 tests, Defendants lured patients to their services by promising to provide fast at-home COVID-19 lab tests that could be self-administered by patients.

6. They then submitted claims for payment representing that they had performed FDA-approved PCR *lab* tests and specimen collection services, none of which was true.

7. Defendants also used the patient's identification and health plan information to submit bills for services that were simply not performed at all.

8. Ultimately, Defendants' conduct resulted in over $2.4 million in wrongful payments from Aetna.

## THE PARTIES

9. Aetna Life Insurance Company is a citizen of Connecticut with its principal place of business in Hartford, Connecticut. Aetna is, and at all times mentioned herein was, qualified to conduct business in the state of New York.

10. Defendant Fast Lab Technologies, LLC is a Wyoming limited liability company with its principal place of business of 1178 Broadway New York, NY 10001. Fast Lab's CEO and sole member is Cemhan Biricik, a photographer and media "entrepreneur" that has no known prior experience in healthcare. He is a citizen of Florida and, upon information and belief, also a citizen of New York. No member of Fast Lab is a citizen of Connecticut or a citizen of "no state" under Section 1332(a)(1).

11. Defendant Martin Perlin is the Medical Director of Fast Lab and a New York citizen. Upon information and belief, Dr. Perlin resides in Mount Kisco, New York.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of

citizenship between Aetna and Defendants, and because the amount in controversy between Aetna and Defendants exceeds $75,000.00, exclusive of interest and costs.

13. Venue is appropriate because the complained of acts, including the services and fraudulent billing, occurred in this District.

## RELEVANT BACKGROUND

### I. Aetna Relies Upon Providers to Submit Accurate Information in Claim Forms

14. Aetna administers and/or insures health benefit plans and/or policies sponsored by employers and the government. Individuals enrolled in these plans are referred to as Aetna "members." Individuals and entities that provide services are referred to as "providers." The plans provide for payment of covered health services rendered by eligible providers to Aetna's members.

15. To obtain payment for services rendered, healthcare providers submit insurance claims by completing standard billing forms (*i.e.*, CMS 1500 or HCFA forms). By law, these forms require providers to use numerical codes that accurately describe certain material details about the services provided, such as the procedure, the time and place the procedure was performed, the member's diagnosis, and the individual

4

that performed the service. The codes used on billing forms are maintained by the American Medical Association's Current Procedural Terminology ("CPT") and the CMS Healthcare Common Procedure Coding System ("HCPCS"). *See* 45 C.F.R. §§ 162.1002(a)(5), (b)(1) & (c)(1).

16. Aetna relies upon providers to submit accurate information and make truthful representations on claim forms to determine coverage and payment. Indeed, claim forms are generally submitted without medical records and processed solely based upon the provider's representations in claim forms.

17. Providers like Defendants intend for Aetna to rely upon the statements contained within a claim form when determining payment for services. Indeed, applicable laws, the claim forms themselves, and Aetna require that all claim submissions be certified as correct and complete and that the benefits being claimed be limited to charges actually incurred.

## II. The Government Enacted Multiple Measures to Expand Access to COVID-19 Testing

18. The onset of the pandemic brought with it an urgent need to test individuals for COVID-19. As a result, on March 18, 2020, Congress passed the Families First Coronavirus Response Act ("FFCRA"), Pub. L.

5

No. 116-127. Broadly speaking, the FFCRA required health plans and insurers to cover COVID-19 tests and testing in certain qualifying situations. Insurers and health plans were also prohibited from imposing any cost-sharing (*i.e.*, deductibles, copayments, and coinsurance), prior authorization requirements, or other traditional means used to control and/or lessen healthcare costs.

19.   The prohibition extended to both COVID- 19 test services, and any other items or services furnished to an individual during healthcare provider office visits that related to the test administration or the need to evaluate patients to determine the need for a test.

20.   On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136. Section 3203 of the CARES Act ensures that "group health plans" and "health insurance issuers" provide coverage for "any qualifying coronavirus preventive service."[1]

21.   Broadly speaking, there are two categories of COVID-19 tests: (i) "antigen" tests (often referred to as "rapid" tests), and (ii)

---

[1] There are situations where the FFCRA and CARES Act did not require insurers to cover COVID-19 testing, such as testing for public health surveillance or workplace testing.

6

Polymerase chain reaction ("PCR") tests.

22. Antigen tests allow for quick results. They are "point of care" tests where the nasal swab, specimen analysis, and test results are administered at the same location. As relevant here, if performed by an eligible professional in the office, they are often billed using CPT 87811.

23. Polymerase chain reaction ("PCR") COVID-19 tests usually take longer to get results and are performed in a lab. As relevant here, if performed under the direction of a qualified provider, these tests are billed using codes U0003, U0005, and 87635. They normally require "specimen handling" to collect the samples and transport them to a laboratory for analysis. Specimen handling services are billed using G2023.

24. The initial coverage requirements of the FFCRA and Cares Act were primarily directed at COVID-19 testing done by clinical professionals or their qualified subordinates after an individual assessment, not "at-home" tests self-administered by patients themselves.

25. That changed on January 15, 2022, when the government required private plans to cover up to eight over the counter ("OTC")

COVID-19 tests per individual per month. This coverage requirement was primarily meant to address tests that were, *inter alia*: (i) self-administered using specimens that were self-collected, and (ii) authorized, cleared, or approved by the Food and Drug Administration (the "FDA"). As a practical matter, because PCR tests require "specimen collection" by a professional (or under their supervision), this mandate was only applicable to antigen COVID-19 tests or alternative, non-PCR COVID-19 tests that were authorized for at-home use.

26. To ensure accurate billing and prevent exploitation by providers, the Federal Government, through the Centers for Medicare and Medicaid Services (CMS), issued billing guidance that specifically instructed providers seeking reimbursement for OTC at-home tests to use HCPCS code K1034.

### III. Defendants' Fraudulent Scheme

27. Fast Lab was created in 2021 by a self-titled media "entrepreneur" and photographer to profit from the COVID-19 pandemic and heightened demand for testing. Dr. Perlin – who previously had his license suspended in Connecticut due to problematic conduct – was hired as Fast Lab's Medical Director shortly after its founding.

28. Attempting to exploit the aforementioned coverage mandates, Defendants concocted a scheme to provide "at-home" PCR testing with results in as little as 24 hours.

29. PCR tests cannot be performed at home. Indeed, the Centers for Disease Control and Prevention (CDC) has only defined antigen tests as "at-home tests."[2] PCR tests require specimen collection and transport to a qualified lab or approved device at approved locations.[3]

30. It is therefore unsurprising that Fast Lab's tests were not, and are not, approved, cleared, or authorized by the FDA. They would not be eligible for coverage under any health benefit plan or government regulation.

31. Moreover, by definition, most of the procedures Defendants billed for could only be performed by a physician or with a physician's supervision. Indeed, under AMA guidance, CPT 87635 and 87811 – like

---

[2] The CDC distinguishes antigen tests from PCR tests, and notes that "[s]elf-tests, or at-home tests, are antigen tests that can be taken anywhere without having to go to a specific testing site." *See* COVID-19 Testing: What You Need to Know, available at: https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/testing.html#:~:text=A%20single%20PCR%20test%20can,to%20a%20specific%20testing%20site (last visited: January 17, 2023).

[3] While it might be theoretically possible for a person to collect their own sample at home and deliver a viable sample to a lab, the PCR test itself cannot be done at home.

other Pathology and Laboratory codes – must be provided by a physician or a qualified individual under a physician's supervision.

32. Nevertheless, Defendants submitted bills to Aetna representing that not only were they providing FDA-approved PCR tests, but that they were also carrying out specimen collection services.[4] As noted, Defendants' tests were not eligible for reimbursement, and Defendants could not have performed specimen collection for PCR tests "at home."[5]

33. In addition, Defendants submitted bills for a few antigen tests using CPT 87811 – which denotes an antigen test administered in an office – instead of CPT K1034 to denote an at-home test. As a result, they were able to obtain significantly higher payments than they would have received for an at-home test.

34. It gets worse. Upon information and belief, Defendants used the plan and identity information they obtained from Aetna's members

---

[4] Aetna required members themselves to submit claims to Aetna for at-home tests instead of providers. Thus, Defendants should not have been submitting any claims to Aetna for "at home" tests.

[5] Upon information and belief, Defendants' claim forms contain a host of other misrepresentations, such as those pertaining to the patients' diagnosis, place of service, and servicing provider.

10

to then submit claims for services that they did not provide at all.

35. Dr. Perlin was personally involved in the scheme. His provider billing information was used to submit many of the claims, and he was listed as the servicing and/or referring provider on many of Defendants' claims even though the tests were apparently carried out at-home without the services of any professional outside of a lab.

36. Defendants' fraudulent scheme caused Aetna to make over $2.4 million in improper payments. A spreadsheet containing information sufficient to identify the claims and wrongful payments is attached hereto as Exhibit A, and additional information will be provided upon the entry of a HIPAA-qualified protective order.

## COUNT I
## FRAUD AND FRAUDULENT CONCEALMENT
### (All Defendants)

37. Aetna realleges and incorporates paragraphs 1-36 as if fully set forth herein.

38. As noted above, Defendants engaged in a fraudulent scheme to defraud Aetna by submitting fraudulent health insurance claims for services that were not rendered or were rendered unlawfully and which

11

contained material misrepresentations concerning their entitlement to payment of benefits from Aetna.

39. Specifically, Defendants represented that they performed COVID-19 tests that were FDA-approved, eligible for reimbursement, and performed by the appropriate personnel. All of these representations were false.

40. Defendants also represented that they performed specimen collection services. These representations were also false and specimen collection was not performed.

41. The specific details of each representation are set forth in the spreadsheet attached hereto as Exhibit A.

42. Defendants had superior knowledge of the misrepresented facts, which were unavailable to Aetna. And Defendants knew their representations were material to Aetna's reimbursement decisions.

43. Aetna reasonably and materially relied upon the fraudulent health insurance claims submitted by or on behalf of Defendants in making their reimbursement and coverage determinations.

44. As a result of the fraudulent misrepresentations, Aetna has suffered harm and damages, including, but not limited to, all amounts

paid by Aetna in reliance on the claim forms, costs of investigation, costs of suit, and attorneys' fees.

## COUNT II
## NEGLIGENT MISREPRESENTATION
## (All Defendants)

45. Aetna realleges and incorporates paragraphs 1-44 as if fully set forth herein.

46. Defendants negligently misrepresented information on health insurance claims submitted to Aetna for payment for services that were not rendered and/or were ineligible for reimbursement.

47. Defendants had a duty to verify the accuracy and completeness of information contained on claim forms they signed, certified as true, and submitted to Aetna for reimbursement.

48. Defendants knew, or should have known, that the claims they submitted misrepresented the services rendered.

49. Aetna foreseeably and reasonably relied upon the representations of Defendants to its detriment in issuing payment.

50. As a result, Aetna has suffered damages and irreparable harm, including but not limited to, amounts paid because of Defendants' misrepresentation.

51. The actions of Defendants were the direct and proximate cause of the damages to Aetna.

## COUNT III
## UNJUST ENRICHMENT
## (All Defendants)

52. Aetna realleges and incorporates paragraphs 1-51 as if fully set forth herein.

53. Aetna conferred benefits on Defendants by paying healthcare claims that they were not actually entitled to receive.

54. Defendants have unjustly accepted and retained the benefit that Aetna conferred on them.

55. Because it would be unjust and inequitable for Defendants to continue to retain the benefits that Aetna conferred on them, Aetna seeks the return of the money paid.

## COUNT IV
## MONEY HAD AND RECEIVED
## (All Defendants)

56. Aetna realleges and incorporates paragraphs 1-55 as if fully set forth herein.

57. Defendants received and obtained possession of money belonging to Aetna.

58. Defendants benefitted from the receipt and possession of these funds.

59. Defendants' retention of these funds is unjust and equity and good conscience demand their return to Aetna.

60. Aetna would not have paid the claims but for Defendants' misconduct.

61. Defendants benefitted from the receipt of over $2.4 million in wrongful payments.

## COUNT V
## INSURANCE FRAUD, Conn. Gen. Stat. § 53-442 – 444
## (All Defendants)

62. Aetna realleges and incorporates paragraphs 1-61 as if fully set forth herein.

63. Defendants are persons under the Connecticut Health Insurance Fraud Act.

64. Defendants presented or caused to be presented – and/or assisted, abetted, solicited, or conspired to present – written statements in support of insurance claims to Aetna containing false, incomplete, deceptive or misleading information concerning material facts relating

to, *inter alia* the services, diagnosis, and places of service as set forth herein.

65. Defendants further presented or caused to be presented written statements that omitted the material facts that the services provided were not FDA-approved, had not been rendered at all, and/or had not been provided in accordance with applicable laws, regulations, and standards.,

66. Defendants knew and intended that Aetna would rely upon its written statements and omissions and intended to defraud Aetna.

67. Aetna reasonably relied upon Defendants' written statements and was aggrieved as a result by wrongfully paying the claims set forth herein.

## COUNT VI
## CIVIL CONSPIRACY
## (All Defendants)

68. Aetna realleges and incorporates paragraphs 1-67 as if fully set forth herein.

69. As set forth above, Defendants engaged in a coordinated scheme, with a common purpose, to improperly and fraudulently bill Aetna for services not rendered or not eligible for reimbursement.

70. Defendants each contributed to the fraudulent scheme and committed overt acts in furtherance of that scheme as detailed herein.

71. As a result, Aetna has suffered damages and irreparable harm, including but not limited to, all amounts paid to Defendants as a result of their false and fraudulent claims.

WHEREFORE, Aetna demands judgment in its favor and against Defendants for all its damages, including all money paid as a result of Defendants' conduct, costs of suit and investigation, attorneys' fees, punitive or treble damages to the extent permitted by law, and all other relief the Court deems appropriate.

## **DEMAND FOR A JURY TRIAL**

Plaintiff Aetna Life Insurance Company demands a jury trial on all Counts so triable.

Dated: March 19, 2024                      Respectfully submitted,

                                        **FOX ROTHSCHILD LLP**

                                        By: */s/ John Wait*
                                              John Wait
                                              101 Park Avenue, 17th Floor
                                              New York, NY 10178
                                              T: (610) 397-6500
                                              F: (610) 397-0450
                                              bmccoy@foxrothschild.com
                                              jwait@foxrothschild.com

Benjamin McCoy
(*pro hac vice forthcoming*)

                                         *Counsel for Plaintiff*