UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
AETNA LIFE INSURANCE COMPANY,

                          Plaintiff,                          24-cv-2057 (PKC)

              -against-                                       OPINION AND ORDER

FAST LAB TECHNOLOGIES, LLC and
MARTIN PERLIN, MD,

                          Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.,

        Plaintiff Aetna Life Insurance Company ("Aetna") initiated this action against

defendants Fast Lab Technologies, LLC ("Fast Lab") and Dr. Martin Perlin, alleging that Fast

Lab and Perlin engaged in a fraudulent COVID-19 testing scheme that resulted in over $2.4

million in wrongful payments from Aetna.  Fast Lab has countersued to recover over $26 million

on more than 81,000 claims for COVID-19 testing services that it alleges it provided to

individuals enrolled in Aetna-administered health plans and which Aetna is obligated to

reimburse.  Fast Lab brings counterclaims under the Employee Retirement Income Security Act

of 1974 ("ERISA") and for breach of contract, promissory estoppel, and unjust enrichment.

Aetna now moves to dismiss all of Fast Lab's counterclaims.  For reasons that will be explained,

Aetna's motion will be granted.

BACKGROUND

        The facts are drawn from Aetna's Amended Complaint (ECF 20), Fast Lab's

Second Amended Answer with Counterclaims ("Second Amended Answer") (ECF 49), and the

Second Amended Answer's accompanying Exhibit A (ECF 49-1).  For the purposes of Aetna's

motion to dismiss, the Court accepts well-pleaded allegations in Fast Lab's Second Amended

Answer as true and draws all reasonable inferences in Fast Lab's favor.  See Koch v. Christie's Intern. PLC, 669 F.3d 141, 145 (2d Cir. 2012).

Following the onset of the COVID-19 pandemic, Congress enacted the Families First Coronavirus Response Act ("FFCRA") and the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in March 2020.  (ECF 49 ¶¶ 106, 107, 111.)  The FFCRA required group health plans and insurers to provide coverage for COVID-19 diagnostic testing, antibody testing, and related services without applying cost sharing or medical management requirements.  (ECF 20 ¶¶ 18-19; ECF 49 ¶¶ 108-09.)  The CARES Act added a requirement that plans and insurers "reimburse the provider of the diagnostic testing," including out-of-network providers at the full cash price of their services or at a negotiated lower rate.  (ECF 49 ¶¶ 112-13.)  At first, the coverage requirements of the FFCRA and the CARES Act were primarily directed at COVID-19 tests performed by clinical professionals or their qualified subordinates, rather than self-administered at-home or over the counter tests.  (ECF 20 ¶ 24.)  Then, in January 2022, the government mandated that private plans cover up to eight over the counter tests per individual per month.  (Id. ¶ 25.)

Fast Lab is a medical diagnostic laboratory that began conducting polymerase chain reaction ("PCR") COVID-19 testing in December 2021 at public collection sites in New York City.  (ECF 49 ¶¶ 100, 126-27.)  Initially, Fast Lab collected nasal swab samples from patients at these sites and then sent the samples to its laboratory for analysis.  (Id. ¶ 127.)  It later changed its methodology by enabling patients to order saliva-based PCR tests to their homes through its website, self-administer these tests under the guidance of Fast Lab's online clinical personnel, and send samples back to Fast Lab for processing.  (Id. ¶¶ 129-33.)  Fast Lab also offered an antigen, or rapid, testing product that patients could order to their homes and then

administer and interpret the results of under the guidance of clinical personnel.  (ECF 20 ¶ 21; ECF 49 ¶¶ 135-37.)

Aetna administers health plans sponsored by employers and the government that are either governed by ERISA or state or other federal law.  (ECF 20 ¶ 14; ECF 49 ¶ 152.) These plans provide for payment of covered health services rendered by eligible providers to individual Aetna members enrolled in the plans.  (ECF 20 ¶ 14.)  Fast Lab, which is an out-of-network or non-participating provider as to the health plans that Aetna administers, accepted COVID-19 testing patients who were Aetna members.  (ECF 49 ¶¶ 141, 143, 146.)  As part of the registration process for Fast Lab's testing services, Fast Lab asked each of these Aetna members to execute an assignment of benefits electronically providing that the member:

> hereby authorize[s] my Insurance Company to pay by check made payable and made directly to: FAST LAB TECHNOLOGIES, LLC for the medical and surgical benefits allowable, and otherwise payable to me under my current insurance policy, as payment toward the total charges for the services rendered.  I understand that as a courtesy to me, Fast Lab Technologies, LLC will file a claim with my insurance company on my behalf.  However, I am financially responsible for, and hereby do agree to pay, in a current manner, any charges not covered by the insurance payment.  If it is necessary to file a formal collection action, I agree to pay all costs, including reasonable attorney's fees incurred by Fast Lab Technologies, LLC in the collection of the outstanding fees.  Actual Plan Benefits cannot be determined until the claim is received by your insurance company and is based upon their determination of medical necessity.  The information received from the above stated is not a guarantee of payment.

(Id. ¶¶ 163-64.)  After rendering testing services to an Aetna member, Fast Lab submitted a claim for payment to Aetna.  (Id. ¶ 166.)

In total, Fast Lab billed Aetna for 81,149 COVID-19 tests.  (Id. ¶ 98.)  Aetna made over $2.4 million in payments to Fast Lab.  (ECF 20 ¶ 8.)  But it denied more than 81,000 of Fast Lab's reimbursement claims, equating to over $26 million..[1]  (ECF 49 ¶¶ 98, 211.)

Aetna initiated this action against Fast Lab on March 19, 2024.  (ECF 1.)  Aetna alleges that Fast Lab was engaged in a fraudulent scheme whereby it submitted claims for payment falsely representing that it had performed FDA-approved PCR tests and specimen collection services.  (ECF 20 ¶ 6.)  According to Aetna, these representations were false because (1) only antigen, not PCR, tests can be performed at home, and therefore Fast Lab's at-home PCR tests were not FDA-approved and (2) Fast Lab's patients were themselves performing the specimen collection.  (Id. ¶¶ 29-30, 32-33.)  Aetna also alleges that there were other misrepresentations in Fast Lab's claims and that Fast Lab submitted claims for services it did not even render.  (Id. ¶¶ 7, 35-37.)  Aetna claims that Fast Lab's conduct resulted in over $2.4 million in wrongful payments.  (Id. ¶ 8.)  It has asserted claims for fraud and fraudulent concealment, negligent misrepresentation, unjust enrichment, money had and received, insurance fraud under the Connecticut Health Insurance Fraud Act, and civil conspiracy.  (Id. at 15-20.)

In its Second Amended Answer filed on February 20, 2025, Fast Lab alleges that both its PCR and antigen testing methodologies met all the requirements necessary for obtaining reimbursement and that Aetna is obligated to pay it directly for the testing services it provided to Aetna members.  (ECF 49 ¶¶ 134, 138, 174.)  Instead, Aetna "reflexively denied" over 81,000 claims filed by Fast Lab "without providing any legitimate justification."  (Id. ¶ 211.)  Fast Lab's attempts to address the issues that Aetna did raise in telephonic conversations and written

---

[1] Attached to Fast Lab's Second Amended Answer is a 1,529-page exhibit containing a complete list of the claims submitted by Fast Lab regarding Aetna's members.  (ECF 49 ¶ 160; ECF 49-1.)  Among other things, this exhibit lists personal identifying information for each Aetna member in redacted form, the amount (if any) that Aetna paid on the claim, and the name of the plan that the member was enrolled in.  (ECF 49-1.)

correspondence with Fast Lab personnel, including by submitting corrected claims, additional information, and documentary support, were unsuccessful.  (Id. ¶ 197-200.)  Fast Lab's reconsideration requests or appeals of Aetna's adjudication of these claims were all either denied or ignored.  (Id. ¶ 186.)  Fast Lab has asserted four counterclaims related to Aetna's failure to fully reimburse it for the COVID-19 testing services it provided to Aetna members: (1) recovery of ERISA health plan benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), (2) recovery of non-ERISA health plan benefits pursuant to a common law breach of contract theory, (3) promissory estoppel, and (4) unjust enrichment.  (Id. at 38-45.)

Aetna now moves to dismiss Fast Lab's counterclaims under Rule 12(b)(6), Fed. R. Civ. P.  Aetna contends that Fast Lab's counterclaim for ERISA benefits fails for lack of standing and failure to exhaust.  It argues that Fast Lab's counterclaim for breach of non-ERISA plans fails for these same reasons and because the FFCRA and the CARES Act do not contain a private cause of action that could form the basis of any breach.  As to Fast Lab's promissory estoppel and unjust enrichment counterclaims, Aetna contends that they are preempted by ERISA and otherwise fail as a matter of law.

DISCUSSION

Legal Standard

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint."  Inter-American Development Bank v. IIG Trade Opportunities Fund N.V., 16-cv-9782 (PAE), 2017 WL 6025350, at *4 (S.D.N.Y. Dec. 4, 2017) (quoting Orientview Technologies LLC v. Seven For All Mankind, LLC, 13-cv-0538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)).  To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic

Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The Court must examine only the well-pleaded factual allegations, disregarding any legal conclusions, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 678-79.  When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference, . . . matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit."  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)).

A. ERISA Counterclaim

    Aetna first contends that Fast Lab lacks standing to bring an ERISA claim because it has not plausibly alleged that it received valid assignments from Aetna members of their ERISA rights.  Aetna also contends that even if Fast Lab has standing to bring an ERISA claim because its members validly assigned their rights, Fast Lab failed to exhaust its administrative remedies under ERISA.  The Court addresses each argument in turn.

    1. Validity of Fast Lab's Patients' Assignments

    While the parties have briefed this issue as whether Fast Lab has "standing" to bring an ERISA claim, the Second Circuit has clarified that "the question of whether a healthcare provider can sue under ERISA by virtue of an assignment is more properly framed as whether the provider can state a cause of action."  Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Insurance Co., 14-cv-2495 (ER), 2016 WL 4382709, at *5 n.7 (S.D.N.Y. Aug. 16, 2016) (citing American Psychiatric Association v. Anthem Health Plans, Inc., 821 F.3d 352, 359-61 (2d Cir. 2016)).  Nevertheless, the terminology of "standing" is at times utilized in the case law.

- 6 -

"Section 502(a) of ERISA authorizes 'a participant or beneficiary' of an ERISA health plan to bring a private civil action 'to recover benefits due . . . under the terms of th[at] plan.'" Murphy Medical Associates, LLC v. Yale University, 120 F.4th 1107, 1113 (2d Cir. 2024) (quoting 29 U.S.C. § 1132(a)(1)(B)). In addition, the Second Circuit has "carv[ed] out a narrow exception to the ERISA standing requirements to grant standing to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care." Id. (quoting McCulloch Orthopaedic Surgical Services, PLLC v. Aetna Inc., 857 F.3d 141, 146 (2d Cir. 2017)). But the Second Circuit has "made clear that providers cannot bring claims against ERISA health plans pursuant to this exception '[a]bsent a *valid* assignment of a claim,' 'even if they have a direct stake in the outcome of the litigation.'" Id. (quoting McCulloch, 857 F.3d at 148). Therefore, to assert an ERISA claim "a provider must establish that it has a valid assignment of the rights asserted in the complaint that comports with the terms of the benefit plans at issue." Murphy Medical Associates, LLC v. Yale University, 3:22-cv-33 (KAD), 2023 WL 2631798, at *4 (D. Conn. Mar. 24, 2023), aff'd, 120 F.4th 1107; see Murphy, 120 F.4th at 1113 (holding that the plaintiff "failed to allege that Yale Health Plan members executed a valid assignment of benefits in its favor" because the plan "contain[ed] an anti-assignment provision that invalidates any assignments by its members to any provider").

"An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Murphy, 2023 WL 2631798, at *5 (quoting Restatement (Second) Contracts § 317 (1981)). "No words of art are required to constitute an assignment; any words that fairly indicate an intention to make the assignee owner of a claim are sufficient . . . ." Id. (quoting 29 S. Williston, Contracts § 74:3 (4th Ed.)). "Valid

assignments may take a variety of forms . . . unless a statute or contract provides otherwise[.]"
Id. (citation omitted).

        The Court begins by considering whether Fast Lab has plausibly alleged that the
Aetna members assigned it their right to sue for reimbursement under ERISA.  The Court
concludes that it has.  In its Second Amended Answer, Fast Lab quotes the language of the
assignments it alleges each of the Aetna members was asked to execute electronically as part of
the registration process for its testing services.  (ECF 49 ¶¶ 162-65.)  The assignments provided
in relevant part that the Aetna member:

> hereby authorize[s] my Insurance Company to pay by check made payable and
> mailed directly to: FAST LAB TECHNOLOGIES, LLC for the medical and
> surgical benefits allowable, and otherwise payable to me under my current
> insurance policy, as payment toward the total charges for the services rendered.  I
> understand that as a courtesy to me, Fast Lab Technologies, LLC will file a claim
> with my insurance company on my behalf . . . .

(Id. ¶ 164.)  Based on the plain language of this form, the Aetna members authorized Aetna to
pay Fast Lab directly for the testing services it provided.  The Second Circuit has recognized,
albeit in dicta, that a form authorizing an insurer to pay the insured's medical benefits directly to
a provider "normally would constitute an assignment to the provider of the patient's right to
payment."  McCulloch, 857 F.3d at 147.  In McCulloch, the at-issue form had a box requiring the
insured to "authorize the 'payment of medical benefits to the undersigned physician . . . for
services described below'" and another box that "ask[ed] if the provider will 'Accept
Assignment?'"  Id. at 144.  In line with McCulloch, the district court in MC1 Healthcare, Inc. v.
United Health Group, Inc., 3:17-cv-01909 (KAD), 2019 WL 2015949, at *5 (D. Conn. May 7,
2019), reconsideration granted in part on other grounds, 2019 WL 3202965 (D. Conn. July 16,
2019), concluded that a form in which the patient authorized their insurance company to receive
bills from and submit payments directly to the provider "constitutes a legal assignment of both

the right to receive payment and the commensurate right to sue under ERISA for nonpayment." That form noted that it was an "Assignment of Benefits" and stated that the patient was "requesting that my Insurance company submit any payment related to my care at this rendering facility to the Mountainside Treatment Center at PO Box 717, Canaan, CT 06018." Id. at *1. The district court also observed that "numerous" courts outside this Circuit "have concluded that language authorizing an insurance company to pay a provider directly constitutes an assignment of the right to payment and the corollary right to sue under ERISA for nonpayment." Id. at *4 (collecting cases). Indeed, in South Coast Specialty Surgery Center, Inc. v. Blue Cross of California, 90 F.4th 953, 955-56, 959-60 (9th Cir. 2024), the Ninth Circuit reached the same conclusion with respect to a form titled "Assignment of Benefits" that authorized direct payment to a provider through language substantially identical to that used in the form in this case:

> I hereby authorize my Insurance Company to pay by check made payable and mailed directly to: [South Coast] for the medical and surgical benefits allowable, and otherwise payable to me under my current insurance policy, as payment toward the total charges for the services rendered. I understand that as a courtesy to me, the South Coast Specialty Surgery Center will file a claim with my insurance company on my behalf . . . .

While the form that Fast Lab asked the Aetna members to execute did not utilize the term "assignment" like the above forms, no such specific language is necessary for it to constitute an assignment. See Murphy, 2023 WL 2641798, at *5. As with the above forms, its wording clearly conveyed that the Aetna members intended to assign their rights to the payment of insurance benefits to Fast Lab. In fact, "the average patient would have understood that by signing this form he was transferring to [Fast Lab] the right to seek and collect any benefits due under the patient's plan for the services about to be performed by [Fast Lab] . . . in doing so, this same patient would have understood himself to be forfeiting the right to seek and collect those same benefits." MC1 Healthcare, 2019 WL 2015949, at *5. Accordingly, the Court concludes

that Fast Lab's patients' assignments transferred to it the right to payment of benefits and the associated right to sue for non-payment.

Nonetheless, the fact that Fast Lab has plausibly alleged that it is an assignee of the Aetna members' claims under health plans covered by ERISA does not end the Court's standing inquiry. As previously explained, Fast Lab must allege that it received "a *valid* assignment of a claim" that comports with the terms of the at-issue ERISA plan. Murphy, 120 F.4th at 1113 (quoting McCulloch, 857 F.3d at 148). This is because that ERISA plan "could contain an anti-assignment provision or restrictions on the form of any permissible assignment." Michael E. Jones M.D., P.C. v. United Health Group, Inc., 19-cv-7972 (VEC), 2020 WL 4895675, at *4 (S.D.N.Y. Aug. 19, 2020). Looking to plan terms to determine whether purported assignments were valid, the Second Circuit has, for instance, held that "clear" and "definite" anti-assignment provisions "render any members' assignment of benefits to a healthcare provider a 'legal nullity.'" Murphy, 120 F.4th at 1113 (quoting McCulloch, 857 F.3d at 147). Here, Fast Lab seeks to bring tens of thousands of individual claims on behalf of an unknown number of plan beneficiaries pursuant to numerous different Aetna health plans, a "substantial" number of which are governed by ERISA.[2] (ECF 49 ¶¶ 150, 211; see ECF 49-1.) Yet it has not alleged any facts that would allow the Court to reasonably conclude that the assignments it received were consistent with the terms of any of the ERISA plans at issue. Fast Lab only offers the bare legal conclusion that "[u]pon information and belief, [Aetna's] health plans do not prohibit members from assigning their rights to benefits, including direct payments, under the plan to Fast Lab," (ECF 49 ¶ 227), which the Court must disregard at this stage. See Mbody Minimally Invasive Surgery, P.C. v. Empire Healthchoice Hmo, Inc., 13-cv-6551 (DLC),

---

[2] Fast Lab's list of the claims it submitted to Aetna identifies the health plan associated with each claim but does not specify whether the plan is governed by ERISA or is a non-ERISA plan. (See ECF 49-1.)

2016 WL 2939164, at *4 (S.D.N.Y. May 19, 2016) ("In determining whether contract language prohibits assignment to a healthcare provider, courts apply traditional principles of contract interpretation."). Fast Lab does not allege, for example, that anti-assignment language was entirely absent from all or substantially all of the ERISA plans. To the contrary, and as discussed more fully below, the Second Amended Answer entertains the possibility that the at-issue ERISA plans do contain anti-assignment provisions in arguing that any such provisions would be inapplicable and unenforceable. (See ECF 49 ¶¶ 228-36.) Nor does Fast Lab provide any details regarding any of the ERISA plans under which it seeks payment, such as illustrative examples of anti-assignment language that may be present in these plans, that would enable the Court to assess the validity and effect of the Aetna members' assignments. Therefore, Fast Lab has not plausibly alleged that the assignments it received from the Aetna members were valid under the terms of the relevant ERISA plans so as to permit it to assert an ERISA claim.

Fast Lab advances two principal arguments for why its ERISA claim remains viable notwithstanding any lack of valid assignments in its favor or the presence of anti-assignment provisions in the relevant ERISA plans, neither of which the Court finds persuasive. First, Fast Lab contends that the FFCRA and the CARES Act modified the terms of ERISA health plans to require direct reimbursement by plans of COVID-19 testing services to out-of-network providers and that because it is entitled to direct reimbursement it is a plan beneficiary that is permitted to maintain an ERISA action without the need for an assignment. As the Second Circuit has noted in implicitly rejecting the argument that the FFCRA and the CARES Act modified the status of providers like Fast Lab under ERISA-governed plans, however, the Court "will not lightly infer congressional intent to override ERISA's standing requirements," Murphy, 120 F.4th at 1113, particularly where, as here, Fast Lab "fails to identify any provision

of those statutes that turned providers into ERISA 'claimants' without authorization of a plan

member or beneficiary simply because they offered COVID-19 testing and related services."

Murphy Medical Associates, LLC v. 1199SEIU National Benefit Fund, 24-1880-cv, 2025 WL

763392, at *3 n.2 (2d Cir. Mar. 11, 2025) (summary order).  As the district court in Murphy

Medical Associates, LLC v. Yale University, 3:22-cv-33 (KAD), 2024 WL 988162, at *3 (D.

Conn. Mar. 7, 2024), aff'd, 120 F.4th 1107 observed, Fast Lab's argument is simply a

repackaging of the contention that the FFCRA and the CARES Act provided a private cause of

action for providers to seek reimbursement for COVID-19 testing, which the Second Circuit has

squarely rejected.  See Murphy, 120 F.4th at 1111-13.  Moreover, acceptance of Fast Lab's

argument would conflict with the Second Circuit's holding in Rojas v. Cigna Health and Life

Insurance Co., 793 F.3d 253, 259 (2d Cir. 2015) that "[h]ealthcare providers are not

'beneficiaries' of an ERISA welfare plan by virtue of their . . . entitlement to payment."  In

Rojas, the Second Circuit rejected the argument, similar to the one here, that a section of a health

plan enabling the insurer to pay an in-network provider directly for its medical services conferred

ERISA standing upon it as a beneficiary.  Id. at 256-58.  The court concluded that "beneficiary,"

as that term is used in ERISA, "clearly refers to those individuals who share in the benefits of

coverage—medical services and supplies covered under their health care policy" and that a

provider's "right to payment does not a beneficiary make."  Id. at 258.  Accordingly, the Court

rejects Fast Lab's argument that by virtue of the FFCRA and the CARES Act it has standing to

sue as an ERISA plan beneficiary without needing a valid assignment.

        Second, Fast Lab contends that Aetna's dealings with it about the claims at issue

constitute an intentional waiver of any anti-assignment provisions found in the relevant plans.

Specifically, Fast Lab alleges that Aetna was aware that it had received assignments of benefits

yet did not object to these assignments in its written and oral communications with Fast Lab about its reimbursement claims or during the processing of Fast Lab's appeals. (ECF 49 ¶¶ 231-33.) "[C]ourts in this Circuit have repeatedly rejected similar waiver arguments by plaintiff providers at the motion to dismiss stage." Northern Jersey Plastic Surgery Center, LLC v. 1199SEIU National Benefit Fund, 22-cv-6087 (PKC), 2023 WL 5956142, at *11 (S.D.N.Y. Sept. 13, 2023). "Waiver requires a 'clear manifestation of an intent . . . to relinquish [a] known right' and does not arise from 'mere silence, oversight or thoughtlessness.'" Id. (quoting Neurological Surgery, P.C. v. Aetna Health Inc., 511 F. Supp. 3d 267, 285 (E.D.N.Y. 2021)). "Mere silence regarding [an] anti-assignment provision[] does not constitute a waiver of those provisions." Id. (quoting Neurological Surgery, P.C. v. Travelers Co., 243 F. Supp. 3d 318, 330 (E.D.N.Y. 2017)). For this reason, "courts have rejected waiver arguments premised upon partial or direct payments to providers, direct communications between the parties, and a defendant's failure to object to an attempted assignment, including during an appeals process." Id. (collecting cases); see, e.g., Da Silva Plastic and Reconstructive Surgery, P.C. v. Empire Healthchoice HMO, Inc., 22-cv-07121 (NCM) (JMW), 2025 WL 240917, at *10 (E.D.N.Y. Jan. 17, 2025) ("[C]ontrary to plaintiff's argument, failure to raise anti-assignment language to deny or underpay a claim and frequent communication between parties do not amount to waiver."); Cooperman v. Empire HealthChoice HMO, Inc., 24-cv-00866 (JLR), 2025 WL 950675, at *10-12 (S.D.N.Y. Mar. 28, 2025) (finding no waiver as a result of insurer's direct payments to provider, a "regular, routine course of conduct" between parties that included various forms of communication, or parties' engagement in the administrative appeals process). Here, Fast Lab's allegations concerning waiver are based solely on Aetna's silence in its communications with Fast Lab regarding its members' assignments and thus cannot support a finding of intentional waiver. To the contrary,

that Aetna is now challenging Fast Lab's ERISA standing shows that it has not waived any anti-

assignment provisions. See Da Silva, 2025 WL 240917, at *11; Gordon Surgical Group, P.C. v.

Empire HealthChoice HMO, Inc., 724 F. Supp. 3d 158, 191 (S.D.N.Y. 2024).

    2. Administrative Exhaustion

        Even if Fast Lab had plausibly alleged that it received valid assignments, it has

failed to show that it exhausted its administrative remedies under ERISA before bringing its

ERISA claim. "While ERISA does not contain a statutory exhaustion requirement, the Second

Circuit has recognized a 'firmly established federal policy favoring exhaustion of administrative

remedies in ERISA cases.'" Northern Jersey Plastic Surgery Center, 2023 WL 5956142, at *4

(quoting Paese v. Hartford Life & Accident Insurance Co., 449 F.3d 435, 443 (2d Cir. 2006)).

"[E]xhaustion in the context of ERISA requires only those administrative appeals provided for in

the relevant plan or policy." Id. (quoting Kennedy v. Empire Blue Cross & Blue Shield, 989

F.2d 588, 594 (2d Cir. 1993)).  Although exhaustion is an affirmative defense, the Second Circuit

has explained that dismissal of an ERISA claim at the motion to dismiss stage is appropriate

when "(1) the affirmative defense appears on the face of the complaint, (2) the plaintiff does not

adequately allege exhaustion or concedes it failure to exhaust, and (3) the well-pleaded facts in

the complaint do not sufficiently allege the futility of administrative remedies." Murphy, 2025

WL 763392, at *2.  Indeed, "[c]ourts in this Circuit 'routinely dismiss ERISA claims . . . on a

12(b)(6) motion to dismiss where the plaintiff fails to plausibly allege exhaustion of remedies.'"

Northern Jersey Plastic Surgery Center, 2023 WL 5956142, at *4 (quoting Abe v. New York

University, 14-cv-9323 (RJS), 2016 WL 1275661, at *5 (S.D.N.Y. Mar. 30, 2016); Neurological

Surgery, 511 F. Supp. 3d at 296).

Facts necessary to establish Aetna's exhaustion defense are evident on the face of Fast Lab's Second Amended Answer. As the Court previously noted, Fast Lab is attempting to bring tens of thousands of individual claims pursuant to numerous different Aetna health plans, many of which are governed by ERISA. (ECF 49 ¶¶ 150, 211; see ECF 49-1.) "[E]ach of the claims for reimbursement is technically an individual claim under a plan, subject to the terms and conditions of that plan as then in effect . . . [F]or each patient, a claim first must be pursued under the claim procedures of the plan by the proper party and then, once exhausted, a beneficiary may seek judicial review." Gordon Surgical Group, P.C. v. Empire HealthChoice HMO, Inc., 21-cv-4796 (GHW) (KHP), 2024 WL 3387345, at *2 n.1 (S.D.N.Y. May 16, 2024), report and recommendation adopted as modified, 2024 WL 3012637 (S.D.N.Y. June 12, 2024). To satisfy its pleading requirement, Fast Lab must therefore "'provide the relevant plans' exhaustion requirements' and allege sufficient facts to show adherence to relevant procedures 'as to *each* medical claim.'" Da Silva, 2025 WL 240917, at *5 (quoting Gordon, 724 F. Supp. 3d at 168). In seeking reimbursement for COVID-19 testing done on a massive scale, however, Fast Lab attempts to sidestep this requirement by relying on general and conclusory allegations that fail to differentiate at all between the individual ERISA-governed claims at issue. As to the relevant plans' exhaustion requirements, Fast Lab only alleges that "Explanations of Benefits" and "Explanations of Payment" issued by Aetna "provided the timing and procedure for appealing medical reimbursement claims" and that where these documents failed to provide any guidance it "learn[ed] of the appropriate reconsideration or appeals procedures" from Aetna. (ECF 49 ¶¶ 176, 179, 180-82.) Fast Lab does not offer language from a single ERISA-governed plan detailing that plan's appeals procedure or otherwise specify the exhaustion requirements set forth in any such plan. Regarding its adherence to the required appeals procedures, Fast Lab

simply alleges that it "followed those procedures," that "all reconsideration requests or appeals . . . were timely submitted in accordance with [Aetna's] procedures and requirements," and that "[i]n all cases" its reconsideration requests and appeals "were either denied . . . or Fast Lab never received a response . . . ." (Id. ¶¶ 182, 185, 186.) Fast Lab fails to provide even one example of a particular claim that it attempted to exhaust and the specific procedures that it followed with respect to that claim. In sum, Fast Lab's allegations are "'devoid of context and content' that would permit a reasonable inference that [it] followed the appeal procedures required by the [p]lans." Gordon, 724 F. Supp. 3d at 185 (quoting Neurological Surgery, 511 F. Supp. 3d at 294). The Second Amended Answer "lacks a basis to reasonably infer what each ERISA plan's appeals procedure required, whether [Fast Lab] followed that procedure, when the appeal was taken, and when the appeal was decided." Murphy Medical Associates, LLC v. EmblemHealth, Inc., 3:22-cv-59 (CSH), 2024 WL 4388305, at *14 (D. Conn. Oct. 3, 2024) (quoting Neurological Surgery, 511 F. Supp. 3d at 294). Even where, as here, a substantial number of individual claims are involved, ERISA does not countenance the approach that Fast Lab has taken in the Second Amended Answer to meeting its pleading burden as to exhaustion. See Da Silva, 2025 WL 240917, at *5 ("Plaintiff's attempt to describe general similarities between the more than 1,000 failed appeals in this case does not cure its pleading deficiencies.").

The Court is mindful that the large number of claims at issue in this case may make it challenging for Fast Lab to adequately plead exhaustion. But "[t]hat exhausting one's administrative remedies may be time-consuming or burdensome does not obviate [Fast Lab's] need to do so." Gordon, 724 F. Supp. 3d at 169. "The requisites for bringing an ERISA claim are well-established, whether the claim is brought by a plan beneficiary or an assignee of a plan beneficiary." Murphy, 2024 WL 988162, at *3. As it stands, Fast Lab's pleading does not

reflect any effort undertaken by Fast Lab to review the relevant ERISA plans' appeals

procedures or contain any attempt to detail those procedures for at least a representative sample

of the plans or those plans that may contain similar language to one another.  Nor does Fast

Lab's pleading include, at a minimum, illustrative examples of specific claims that it attempted

to exhaust that are directly associated with the appeals processes it undertook and the responses

it received from Aetna.  While the Court will not dictate or predict what additional or revised

allegations may allow Fast Lab to satisfy its pleading burden, it is clear that without more it has

not met that burden here.

        Fast Lab argues that to the extent it did not adequately plead exhaustion, the

exhaustion requirement should be excused as futile.  "Where a plaintiff makes a 'clear and

positive showing that pursuing administrative remedies would be futile, the purposes behind the

requirement of exhaustion are no longer served, and thus a court will release the claimant from

the requirement.'"  Da Silva, 2025 WL 240917, at *5 (quoting Kennedy, 989 F.2d at 594).  "The

standard for demonstrating futility, however, is 'very high.'"  Id. (quoting Quigley v. Citigroup

Supplemental Plan for Shearson Transfers, 09-cv-8944 (PGG), 2011 WL 1213218, at *6

(S.D.N.Y. Mar. 29, 2011)).  "Where plaintiffs merely 'rely on conclusory statements to attempt

to demonstrate that it would have been futile to exhaust administrative remedies,' they have not

made the necessary 'clear and positive showing' to argue futility."  Id. (quoting Murphy Medical

Associates, LLC v. 1199SEIU National Benefit Fund, 23-cv-6237 (DEH), 2024 WL 2978306, at

*5 (S.D.N.Y. June 12, 2024), aff'd, 2025 WL 763392).  In this case, Fast Lab has not shown

futility because, as discussed above, it has not adequately alleged that it "ever attempted to

participate in the appropriate appeals processes provided by the various [p]lans."  Gordon, 724 F.

Supp. 3d at 186.  In other words, Fast Lab has not shown that it "'appealed' as that term is used

in ERISA precedent – *i.e.*, pursuant to the ERISA plan provisions." Neurological Surgery, 511 F. Supp. 3d at 297. Fast Lab's allegation that Aetna "routinely . . . failed to decide appeals of claim denials" is therefore beside the point here. (ECF 49 ¶ 194.) And Fast Lab's additional allegations that it "attempted to resolve all of [Aetna's] issues, concerns, and denials of [its] claims" through telephonic conversations, written correspondence, and by submitting "corrected claims, requested information, and documentary support" to no avail, (id. ¶¶ 196-200), do "not render futile further pursuit of [its] claims through the proper channels." Gordon, 724 F. Supp. 3d at 186 (quoting Neurological Surgery, 511 F. Supp. 3d at 297) (emphasis added).

       Fast Lab's remaining arguments as to futility are unavailing. Fast Lab alleges that Aetna "regularly, consistently, and routinely issued blanket denials" of its claims or "reflexively denied more than 81,000 claims for clearly reimbursable services, without providing any legitimate justification . . . ." (ECF 49 ¶¶ 189, 211.) Not only does Fast Lab fail to support these conclusory allegations by detailing the contents of Aetna's denials as to any specific claim for reimbursement, but it also severely undermines them by alleging that (1) "[i]n many cases" it received "Explanations of Benefits," "Explanations of Payment," or other documents from Aetna as to its "adjudication of the submitted claims, along with the reimbursement (if any) that [Aetna] determined was appropriate" and (2) "Fast Lab personnel engaged in extension [sic] telephonic conversations and written correspondence with [Aetna's] personnel regarding the nature of Fast Lab's services, purported issues and inadequacies with Fast Lab's claims documents, allegedly appropriate and inappropriate (from [Aetna's] point of view) claim coding, and documents that needed to be furnished to allegedly substantiate the claims."[3] (Id. ¶¶ 176, 197.) Relatedly, Fast Lab alleges that Aetna's "blanket" denials were for reasons "in direct

---

[3] Further contradicting Fast Lab's allegations of blanket or reflexive denials, (ECF 49 ¶¶ 189, 211), Aetna alleges in the Amended Complaint that it made over $2.4 million in payments to Fast Lab. (ECF 20 ¶ 41.)

contravention of the requirements of the FFCRA and the CARES Act," such as "failure to pre-certify or pre-authorize" the testing service and that the claims were "not covered under the plan, which is in direct contravention of [the] FFCRA's coverage mandate." (Id. ¶¶ 189-92.)  But Fast Lab does not allege that it disputed or otherwise responded to these particular bases for Aetna's initial claim denials in any appeal of a specific claim.  See Greifenberger v. Hartford Life Insurance Co., 131 Fed. App'x 756, 759 (2d Cir. 2005) ("The complaint . . . merely asserts that Hartford denied coverage for long term disability benefits that were properly due under the policy.  This is precisely the sort of claim properly raised on administrative appeal.") (summary order).  To the extent that Fast Lab is alleging futility on the grounds that its appeals would have been denied for the same reasons that its initial claims were denied, that argument also falls short.  See Constantini v. Hartford Life and Accident Insurance Co., 21-cv-6826 (LGS), 2022 WL 1910137, at *3 (S.D.N.Y. June 3, 2022) ("[C]onclusory allegations that an appeal would have fallen on deaf ears are not sufficient to make a clear and positive showing that the appeal process would have been futile."); Greifenberger, 131 Fed. App'x at 759 ("To the extent Griefenberger asserts that Hartford's initial unreasonable denial of her benefits claim indicates the futility of further appeal, this court has expressly ruled that such allegations are insufficient to establish futility . . . .").

Fast Lab next contends that Aetna's position in this lawsuit, including its allegations that Fast Lab engaged in fraud and that none of its testing services were legitimate or reimbursable, makes it clear that further pursuit of administrative remedies would be futile.  "However, the law is clear that a party's position in litigation is insufficient to establish futility." Antell v. United Healthcare Insurance Co. of New York, 10-cv-3194 (RJS), 2012 WL 13042822, at *3 (Mar. 16, 2012); see Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 134 (2d Cir. 2001)

("Defendants' position in this lawsuit does not establish futility.") (citing Wilson v. Globe Specialty Products, Inc., 117 F. Supp. 2d 92, 99 (D. Mass. 2000) (requiring exhaustion where the plan administrator "arguably [had] evidenced an intent to refuse [plaintiff's] claim" because the court would "not predict how [the administrator] would have decided [plaintiff's] claim on review"); Communications Workers of America v. American Telephone and Telegraph Co., 40 F.3d 426, 433 n.1 (D.C. Cir. 1994) (rejecting futility argument based on actions taken after lawsuit was filed to defend a lack of entitlement to benefits because otherwise the exhaustion doctrine would be "entirely undermine[d]," as plaintiffs could "bypass administrative remedies, file suit, and then hope for subsequent events to justify their futility claims")).  Lastly, Fast Lab alleges myriad failures on the part of Aetna to comply with ERISA's claims-processing requirements that it contends render exhaustion futile.  (ECF 49 ¶¶ 202-07, 213-14.)  Again, though, Fast Lab "does not make these assertions with respect to any specific claim or describe how these actions would have rendered appeal of any individual claim futile."  Da Silva, 2025 WL 240917, at *6.  It has therefore failed to support these conclusory allegations by pleading supporting facts.

For these reasons, the Court will dismiss Fast Lab's counterclaim for ERISA benefits.

B. State-Law Counterclaims

1. Breach of Contract

Fast Lab also asserts a breach of contract counterclaim limited to Aetna's non-ERISA health plans based on Aetna's failure to make reimbursement payments for the COVID-19 testing services that Fast Lab provided, as required by the FFCRA and the CARES Act.  (ECF 49 ¶¶ 250, 256.)  It is undisputed in light of Fast Lab's status as an out-of-network provider that there was no express contract between Fast Lab and Aetna.  Thus, "as a third party to the [non-

ERISA] benefit plan[s], [Fast Lab's] ability to bring a breach-of-contract claim against [Aetna]

rests on whether [it] received a valid assignment from a[n] [Aetna] member." Murphy, 120 F.4th

at 1114.  For the reasons discussed above, Fast Lab has failed to plead that it received valid

assignments from the Aetna members pursuant to the terms of either the ERISA plans or non-

ERISA plans at issue.  Nor has Fast Lab shown, as previously explained, that Aetna's dealings

with it constitute an intentional waiver of any anti-assignment provisions found in the relevant

plans.

        The Court rejects Fast Lab's contention that the FFCRA and the CARES Act

provide an independent basis for its breach of contract claim by overriding, amending, or

supplementing the terms of Aetna's non-ERISA plans.  "The legislation does not purport to

establish contractual rights between insurers and medical providers." Murphy, 2023 WL

2631798, at *9 n.6.  Indeed, to accept Fast Lab's argument would be to permit an end run around

the Second Circuit's conclusion that the FFCRA and the CARES Act do not provide a private

cause of action for providers to seek reimbursement for COVID-19 testing. See Murphy, 120

F.4th at 1111-13

        Accordingly, the Court will dismiss Fast Lab's breach of contract counterclaim.

   2. Promissory Estoppel

        Fast Lab next brings a promissory estoppel claim, which Aetna contends fails as a

matter of law.  There are three elements of a claim for promissory estoppel under New York law:

"1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise;

and 3) injury to the relying party as a result of the reliance." Kaye v. Grossman, 202 F.3d 611,

615 (2d Cir. 2000).  Here, Fast Lab's claim is premised on statements that Aetna made on its

website "that it would reimburse out-of-network providers such as Fast Lab[] directly and at their

standard cash price (if no other price was agreed to) for providing COVID-19 testing services to

its enrollees," which Fast Lab alleges constituted a "clear and unambiguous promise" by Aetna

"to fully reimburse Fast Lab." (ECF 49 ¶¶ 263, 265.) The Second Amended Answer includes

examples of Aetna's public statements taken from an Aetna webpage titled "COVID-19: Patient

coverage FAQs" that appears to have been directed to healthcare providers:[4]

> **Will Aetna cover the cost of COVID-19 testing for members?**
> **(As of 11/09/2020)**
>
> Yes. In addition, Aetna is waiving member cost-sharing for diagnostic testing
> related to COVID-19. The test can be done by any authorized testing facility. This
> member cost-sharing waiver applies to all Commercial, Medicare and Medicaid
> lines of business. The policy aligns with the Families First and CARES legislation
> and regulations requiring all health plans to provide coverage of COVID-19 testing
> without cost share. The requirement also applies to self-insured plans. Per
> guidance from the Centers for Medicare & Medicaid Services (CMS), the
> Department of Labor and the Department of the Treasury, all Commercial,
> Medicaid and Medicare plans must cover COVID-19 serological (antibody) testing
> with no cost-sharing.
>
> **Will Aetna cover COVID-19 diagnostic and antibody tests under any**
> **circumstance?**
> **(As of 11/09/2020)**
>
> Aetna will cover, without cost share, diagnostic (molecular PCR or antigen) tests
> to determine the need for member treatment. This includes direct-to-
> consumer/home-based diagnostic or antigen tests. Aetna's health plans generally
> do not cover a test performed at the direction of a member's employer in order to
> obtain or maintain employment or to perform the member's normal work functions
> or for return to school or recreational activities, except as required by applicable
> law.
>
> **If Aetna waives a member cost-sharing obligation related to COVID-testing**
> **and/or treatment, will that reduce the amount the provider is paid?**
>
> No, Aetna will pay the amount of the cost-sharing the member would have
> ordinarily paid so the provider would receive the same total payment[.]

---

[4] https://web.archive.org/web/20210124071743mp_/https://www.aetna.com/health-care-professionals/covid-faq/patient-coverage.html (last accessed Aug. 26, 2025).

(Id. ¶¶ 123-25.)  Fast Lab alleges that "after learning about these public statements, [it] reasonably and foreseeably relied upon them and acted in good faith by providing COVID-19 testing services to [Aetna's] enrollees."  (Id. ¶ 264.)  It adds that Aetna's failure to fulfill its promise "depriv[ed] Fast Lab of substantial revenue exceeding $26 million."  (Id. ¶ 265.)

        Fast Lab fails to allege any promise by Aetna to reimburse it for all of its COVID-19 testing services, let alone a "clear and unambiguous" one.  Kaye, 202 F.3d at 615.  The public webpage that Fast Lab draws from merely provides, for the benefit of providers as a whole, general responses to frequently asked questions that detail Aetna's compliance with the coverage requirements of the FFCRA and the CARES Act.  (See ECF 149 ¶ 123 ("The policy aligns with the Families First and CARES legislation and regulations requiring all health plans to provide coverage of COVID-19 testing without cost share.")).  The webpage's content is informational, nothing more.  Indeed, the "Legal notices" at the bottom of the webpage say as much: "This material is for information only . . . ."[5]  Viewed in this context, none of Aetna's statements on its webpage, including those highlighted by Fast Lab, can plausibly be understood as a promise from Aetna to Fast Lab or any other provider to fully reimburse them for their testing services. In addition, Fast Lab has not shown that its reliance on these general statements made by Aetna, particularly in light of the webpage's clear disclaimer regarding the limited purpose of its content, was reasonable.  See Herrick v. Grindr, LLC, 306 F. Supp. 3d 579, 598 (S.D.N.Y. 2018), aff'd, 765 F. App'x 586 (2d Cir. 2019) (finding reliance on statements in web-based application's community values page and Terms of Service unreasonable due to disclaimer in Terms of Service).

---

[5] Id.

Therefore, the Court will dismiss Fast Lab's promissory estoppel counterclaim for failure to state a claim.

### 3. Unjust Enrichment

Aetna also seeks to dismiss Fast Lab's unjust enrichment counterclaim for failure to state a claim. To state a claim for unjust enrichment in New York, a plaintiff must plausibly allege "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." Kaye, 202 F.3d at 616 (quoting Dolmetta v. Uintah National Corp., 712 F.2d 15, 20 (2d Cir. 1983)). The plaintiff's allegations must show that the defendant "received some benefit" from the plaintiff that was "specific and direct," rather than an "indirect" benefit. Id. At bottom, the "specific and direct" benefit that Fast Lab provided here was its COVID-19 testing services to Aetna's members. Id. "[I]n the health insurance context, courts have repeatedly held that providers cannot bring unjust enrichment claims against insurance companies based on the services rendered to the insureds." Abira Medical Laboratories, LLC v. Cigna Health and Life Insurance Company, 24-2837-cv, 2025 WL 1443016, at *2 (2d Cir. May 20, 2025) (collecting cases) (summary order). That is because in this context there is no provision of a benefit from the provider to the insurance company:

> It is counterintuitive to say that services provided to an insured are also provided to its insurer. The insurance company derives no benefit from those services; indeed, what the insurance company gets is a ripened obligation to pay money to the insured – which can hardly be called a benefit.

Murphy, 2023 WL 2631798, at *8-9 (quoting Travelers Indemnity Co. of Connecticut v. Losco Group, Inc., 150 F. Supp. 2d 556, 563 (S.D.N.Y. 2001)); see Rowe Plastic Surgery of New Jersey, L.L.C. v. Aetna Life Insurance Co., 23-8083, 2024 WL 4315128, at *3 (2d Cir. Sept. 27, 2024) (holding that the providers' unjust enrichment claim against an insurer failed under New York law because "[i]t was the patient, not [the insurer], who received the benefit of the

Providers' direct services") (summary order).  Because Fast Lab only alleges "abstract and attenuated indirect benefit[s]" to Aetna from its testing services, Rowe, 2024 WL 4315128, at *3, including improved patient health outcomes and resulting cost savings, it fails to state a claim for unjust enrichment.  (ECF 49 ¶¶ 272-75.)

Fast Lab's contention that this limitation on unjust enrichment claims brought by providers against insurance companies is inapplicable in this case because its COVID-19 testing was an emergency service is misplaced.  It is well-established in New York that "to recover under a theory of unjust enrichment, the plaintiff must show that the services were performed '*for the defendant*,' and not at the 'behest of someone other than the defendant.'"  Rowe, 2024 WL 4315128, at *4 (quoting Kagan v. K-Tel Entertainment, Inc., 172 A.D.2d 375, 376 (1st Dept. 1991)).  With that understanding, "New York courts have drawn a clear distinction between unjust enrichment cases involving emergency medical services, and those involving elective medical services."  A.A. Medical, P.C. v. Centene Corp., 21-cv-5363 (JS) (ST), 2023 WL 5670682, at *4 (E.D.N.Y. June 30, 2023).  In the former cases, courts have found that "when a provider brings an unjust enrichment claim against an insurer after it provides *emergency* medical services to the insured," it need not demonstrate, as is required when elective services are involved, that it performed the services for, or at the behest of, the defendant.  Jay Kripalani M.D., P.C. v. Independence Blue Cross, 23-cv-04225 (NRM) (ARL), 2024 WL 4350492, at *8 (E.D.N.Y. Sept. 30, 2024).  But, as Fast Lab fails to note, that distinction is entirely premised on the provider being required by law to provide the emergency service such that "an insurance company is unjustly enriched if it fails to pay the hospital in full for the costs it incurred in rendering the necessary treatment to the insurer's enrollees."  AA Medical, 2023 WL 5670682, at *4 (quoting New York City Health and Hospitals Corp. v. Wellcare of New York, Inc., 937

N.Y.S.2d 540, 545 (N.Y. Sup. Ct. 2011)). <u>AA Medical</u>, for instance, involved the Emergency

Medical Treatment and Active Labor Act ("EMTALA") "under which a care provider must

provide emergency services without regard to a patient's insurance coverage or ability to pay."

<u>Id.</u> at \*4.  Under those circumstances, "the [provider's] provision of emergency medical care

discharge[s] the [insurer's] obligation to make such care available to its insureds."  <u>Emergency</u>

<u>Physician Services of New York v. UnitedHealth Group, Inc.</u>, 749 F. Supp. 3d 456, 475

(S.D.N.Y. 2024).  In contrast, "in instances of voluntary or elective medical treatment . . . where

an individual patient seeks medical care and the care provider is afforded an opportunity to

provide or decline care, the benefit runs entirely to the patient and not an insurer." <u>A.A.</u>

<u>Medical</u>, 2023 WL 5670682, at \*5.

      While the COVID-19 pandemic amid which Fast Lab provided its testing services

undoubtedly constituted a public health emergency, Fast Lab does not allege that it was required

by law to provide its COVID-19 testing services to Aetna members.  Fast Lab has therefore

failed to sufficiently plead an unjust enrichment claim based on the provision of emergency

services.  <u>See</u> <u>id.</u> at \*5 (identifying "the determining factor" as whether the provider had

"sufficiently pled that each patient's treatment . . . involved emergency services" and holding

that it had done so because it alleged that the patients "received emergency treatment under

EMTALA").  Indeed, "[i]t is precisely because a hospital is required to provide such treatment

that 'payment of less than actual costs [is] unreasonable and, thus, inequitable.'"  <u>Id.</u> at \* 4

(quoting <u>Wellcare</u>, 937 N.Y.S.2d at 544).  To the contrary, the Court reasonably infers based on

the Second Amended Answer's allegations that Fast Lab voluntarily provided COVID-19 tests to

those Aetna members who believed they needed them and had sought out Fast Lab's services.

(See ECF 49 ¶¶ 126-35.) Accordingly, and as previously explained, the benefit of Fast Lab's services ran entirely to the Aetna members and not to Aetna.

For these reasons, the Court will dismiss Fast Lab's unjust enrichment counterclaim for failure to state a claim.

4. ERISA Preemption

Lastly, Aetna argues that even if Fast Lab's promissory estoppel and unjust enrichment counterclaims had been adequately pleaded, those claims would be preempted by ERISA. The Court agrees.[6] "There are 'two separate, but related, doctrines of preemption applicable to ERISA—so called 'complete preemption' and express preemption." Northern Jersey Plastic Surgery Center, 2023 WL 5956142, at *15 (quoting Chau v. Hartford Life Insurance Co., 167 F. Supp. 3d 564, 570 (S.D.N.Y. 2016)). Complete preemption, which is implied from section 502(a) of ERISA, "is 'a jurisdictional concept' that allows a plaintiff's state law claim to be recast 'as a federal claim for relief making [its] removal [by the defendant] proper on the basis of federal question jurisdiction.'" Id. (quoting Vaden v. Discover Bank, 556 U.S. 49, 61 (2009)). On the other hand, express preemption under section 514 of ERISA "is one of the 'three familiar forms' of ordinary defensive preemption (along with conflict and field preemption)." Id. at *16 (quoting Wurtz v. Rawlings Co., LLC, 761 F.3d 232, 238 (2d Cir. 2014)). "Express preemption 'occurs when Congress . . . withdraw[s] specified powers from the States by enacting a statute containing an express preemption provision.'" Id. (quoting Wurtz, 761 F.3d at 238). Aetna is asserting express preemption here.

---

[6] The Court rejects any suggestion by Aetna that ERISA preempts Fast Lab's promissory estoppel and unjust enrichment claims to the extent that they relate to non-ERISA plans and limits its conclusion in this case to the preemption of claims brought pursuant to ERISA-governed plans. Courts regularly distinguish between claims arising from ERISA plans and non-ERISA plans in analyzing the issue of ERISA preemption solely with respect to the former. See, e.g., Murphy, 120 F.4th at 1114.

"ERISA's express preemption provides that ERISA preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by the statute." Id. (quoting 29 U.S.C. § 1144(a)). "The Supreme Court has described this provision as 'deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern." Id. (quoting Pilot Life Insurance Co. v. Dedeaux, 481 U.S. 41, 46 (1987)). "A law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 114 (2d Cir. 2008) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 96-97 (1983)). The Second Circuit has clarified with respect to state common law claims in particular that "ERISA preempts those that seek 'to rectify a wrongful denial of benefits promised under ERISA-regulated plans, and do not attempt to remedy any violation of a legal duty independent of ERISA.'" Id. (quoting Aetna Health Inc. v. Davila, 542 U.S. 200, 214 (2004)).

Fast Lab's promissory estoppel claim is preempted by ERISA because it seeks the recovery of benefits provided by ERISA plans and does not attempt to enforce an obligation independent of those plans. As the Court previously observed, the statements on Aetna's webpage that Fast Lab relies on as constituting a promise by Aetna to fully reimburse it for its COVID-19 testing services in substance merely detail Aetna's compliance with the coverage requirements of the FFCRA and the CARES Act.[7] For instance, Aetna explains in its responses to the frequently asked questions that it is waiving member cost-sharing for COVID-19 diagnostic testing, that it will cover PCR, antigen, or antibody tests, that the cost-sharing waiver applies to testing done by out-of-network providers, and that the cost-sharing waiver will not

---

[7] See https://web.archive.org/web/20210124071743mp_/https://www.aetna.com/health-care-professionals/covid-faq/patient-coverage.html (last accessed Aug. 26, 2025).

reduce the total amount paid to providers,[8] all of which Fast Lab alleges are requirements under

the statutes.  (ECF 49 ¶¶ 108, 112.)  Indeed, Aetna's responses to two of the frequently asked

questions ("Will Aetna cover the cost of COVID-19 testing for members?" and "Does Aetna's

no cost share coverage of COVID-19 testing apply to provider visits in and out of network?")

expressly reference the FFCRA and the CARES Act: "The policy aligns with the Families First

and CARES legislation and regulations requiring all health plans to provide coverage of COVID-

19 testing without cost share.".[9]

>    As other courts have concluded, the FFCRA, the CARES Act, and ERISA are

interrelated statutes.  See Biodiagnostic Labs, Inc. v. Aetna Health Inc. (New York), 23-cv-9570

(BMC), 2024 WL 3106169, at *4 (E.D.N.Y. June 23, 2024) (noting that the FFCRA and the

CARES Act "incorporate ERISA when they are applied to ERISA-governed plans"); Murphy

Medical Associates, LLC v. Cigna Health and Life Insurance Co., 3:20-cv-1675 (JBA), 2022

WL 743088, at *8 (D. Conn. Mar. 11, 2022), reconsideration granted on other grounds, 2022 WL

10560321 (D. Conn. Oct. 18, 2022) ("[T]he reimbursement obligation derives from the

Coronavirus Legislation, which effectively modified the terms of ERISA plans to provide SARS-

CoV-2 tests at no cost to a patient."); Genesis Laboratory Management LLC v. United Health

Group, Inc., 21-cv-12057 (EP) (JSA), 2023 WL 2387400, at *5 (D.N.J. Mar. 6, 2023) ("Section

6001 of the FFCRA and Section 3202 of the CARES Act must be considered together with

ERSIA because they impose legal requirements on ERISA plans.").  While the FFCRA and the

CARES Act neither provide a private cause of action for providers to seek reimbursement for

COVID-19 testing nor modify ERISA's standing requirements, by imposing a reimbursement

obligation on ERISA plans they do enable providers to bring suit under ERISA when an insurer

---

[8] Id.
[9] Id.

denies coverage for COVID-19 testing. This is the basis of Fast Lab's counterclaim for the recovery of ERISA benefits. Because Aetna's statements on its webpage merely detail its coverage obligations under the FFCRA and the CARES Act and expressly reference those statutes, the Court concludes that the FFCRA and the CARES Act, which "incorporate ERISA with regard to ERISA-governed plans," also form the basis of Fast Lab's promissory estoppel claim. Biodiagnostic Labs, 2024 WL 3106169, at *5. Given there is no meaningful distinction between Fast Lab's counterclaim for ERISA benefits and its counterclaim for promissory estoppel, the latter is preempted by ERISA.

The Court's holding is not inconsistent with McCulloch, 857 F.3d 141, which Fast Lab relies on. To be sure, this case raises similar equitable concerns to those that the Second Circuit recognized in McCulloch, namely that an out-of-network provider without a valid assignment "would be barred from pursuing state-law claims in state court on preemption grounds and from pursuing an ERISA claim in federal court for lack of standing" and would in turn "be left without a remedy to enforce promises of payment made by an insurer." Id. at 148. In addition, McCulloch also addressed a promissory estoppel claim brought by an out-of-network provider, which the Second Circuit determined was not preempted by ERISA. Id. at 152. But, unlike here, McCulloch concerned complete preemption under section 502(a) of ERISA rather than express preemption under section 514. Id. at 145. "How express preemption interacts with common law claims brought by third-party medical providers who do not have valid assignments of their patient's benefits remains open within the Second Circuit." Murphy, 2023 WL 2631798, at *8. Furthermore, while McCulloch involved an insurer's oral promises of reimbursement that the Second Circuit found gave rise to an obligation "independent and distinct" from those under the patient's ERISA plan, that is not the case here. Id. at 150. Fast

Lab has not plausibly alleged any promise by Aetna to reimburse it for all of its COVID-19 testing services. Instead, Aetna's statements that Fast Lab relies on simply detail Aetna's compliance with the FFCRA's and the CARES Act's coverage requirements.[10] Notwithstanding Fast Lab's framing of its counterclaim as one for promissory estoppel, it is essentially duplicative of its counterclaim for the recovery of ERISA benefits, as it is the FFCRA and the CARES Act that impose a reimbursement obligation on the at-issue ERISA plans. In contrast to McCulloch, Fast Lab's promissory estoppel claim therefore "arises . . . from an alleged violation of some right contained in the plan," not "from a freestanding state-law duty grounded in conceptions of equity and fairness." Id. at 150.

Fast Lab's unjust enrichment counterclaim is also expressly preempted by ERISA. Fast Lab alleges that it provided COVID-19 testing services to the Aetna members and that Aetna is obligated to pay for those services. (ECF 49 ¶¶ 271-72, 277, 280.) It specifies that Aetna "should fully reimburse Fast Lab for the value and benefit of the COVID-19 diagnostic testing . . . provided to [its] enrollees." (Id. ¶ 284.) This claim "seek[s] reimbursement for COVID-19 tests provided pursuant to ERISA-covered" plans and is therefore "clearly preempted and must be dismissed." Murphy, 120 F.4th at 1114.

Accordingly, had Fast Lab's promissory estoppel and unjust enrichment counterclaims survived, they would be preempted by ERISA.

## CONCLUSION

For the reasons explained above, Aetna's motion to dismiss Fast Lab's counterclaims in the Second Amended Answer is GRANTED. The Clerk of Court is respectfully directed to terminate the motions pending at ECF 37 and ECF 50.

---

[10] See id.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
     August 27, 2025